## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**MICHAEL PERRY MUHAMMAD**                                        **PLAINTIFF**
**ADC #96905**

**V.**                          **NO. 4:21-cv-00491-BRW-ERE**

**LONNELL SEAMSTER,** *et al.*                                    **DEFENDANTS**

### RECOMMENDED DISPOSITION

**I.**       **Procedure for Filing Objections:**

This Recommendation for the dismissal of Mr. Muhammad's claims has been

sent to Judge Billy Roy Wilson. You may file objections if you disagree with the

findings or conclusions set out in the Recommendation. Objections should be

specific and should include the factual or legal basis for the objection.

To be considered, objections must be filed within 14 days. If you do not file

an objection, you risk waiving the right to appeal questions of fact. And, if no

objections are filed, Judge Wilson can adopt this Recommendation without

independently reviewing the record.

**II.**     **Background:**

Michael Perry Muhammad, an Arkansas Division of Correction ("ADC")

inmate, filed this lawsuit without the help of a lawyer under 42 U.S.C. § 1983. *Docs.*

*1, 12.* Mr. Muhammad claims that during his confinement at the ADC's Maximum

Security Unit, Defendants APN Lonnell Seamster, Steven Cook, Patti Anne Conley,

Jasmine Siah, Nurse Shanna Witmore, and Holly Dunavin provided him with constitutionally inadequate medical care for an injured leg, resulting in gangrene.

The Court previously limited the scope of Mr. Muhammad's claims to the time period between November 20, 2020 to February 5, 2021. Mr. Muhammad's claims arising after February 5, 2021 and continuing through June 4, 2021, were dismissed for failure to exhaust administrative remedies. *Docs. 53, 55.*

Defendants filed a motion for summary judgment, brief, and statement of facts on Mr. Muhammad's remaining claims. *Docs. 87-89.* Mr. Muhammad filed a tardy response, statement of facts, and declaration on December 30, 2022.[1] *Docs. 96-99.* However, these filings have been considered by the Court. Defendants' motion for summary judgment is now ripe for review.

For the reasons explained below, Defendants are entitled to summary judgment.

## III.    Discussion:

### A.    Standard

Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.

---

[1] Per an October 18, 2022 Order, Mr. Muhammad's response was due Friday, December 2, 2022. *Doc. 92.*

See FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once that has been done, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. See FED. R. CIV. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). A party is entitled to summary judgment if - but only if - the evidence shows that there is no genuine dispute about any fact important to the outcome of the case. See FED. R. CIV. P. 56; *Odom v. Kaizer*, 864 F.3d 920, 921 (8th Cir. 2017). Because Defendants are the moving party, the Court will construe any disputed facts in a light favorable to Mr. Muhammad.

### B.    Undisputed Facts

This lawsuit has been narrowed to focus on the medical care Mr. Muhammad received for his right leg from November 20, 2020 to February 5, 2021, while he was incarcerated at the ADC. See *Doc. 53 at 11-12*, *Doc. 55*.

In 2010, Mr. Muhammad had a motorcycle wreck and suffered multiple fractures to his right leg. By 2011, the fracture had healed, and Mr. Muhammad was in county jail. In 2013, his leg became infected for the first time. *Doc. 88-3 at 2*.

On or about November 20, 2020, Mr. Muhammad transferred from the ADC's Ouachita River Unit to the Maximum Security Unit, where he remained until February 5, 2021.[2] *Doc. 1 at 11*; *Doc. 88-4 at 22*.

On November 24, 2020, Mr. Muhammad had a telemedicine visit with Dr. Benjamin Carlyle (a non-party) for complaints of a chronic right leg wound. *Doc. 88-1 at 3*. Dr. Carlyle noted Mr. Muhammad's active prescription for doxycycline and directed him to finish taking that prescription. Dr. Carlyle also entered orders for clindamycin and levofloxacin (both antibiotics), directed Mr. Muhammad to be scheduled to see a general surgeon, and advised him to place a sick call if he had any new or worsening complaints. *Doc. 88-1 at 3*.

On November 25, 2020, Mr. Muhammad attempted suicide by cutting himself on the neck with a razor blade. *Id. at 4-5*; *Doc. 88-3 at 25-26*. He was transported to the hospital emergency room where his neck wound was sutured. *Doc. 88-1 at 6*. Later that same day, Mr. Muhammad attempted suicide a second time, this time by cutting his abdomen with a razor blade.[3] *Doc. 88-2 at 7*; *Doc. 88-3 at 25-27*. Mr. Muhammad was taken to the hospital emergency room for treatment again, where he received staples to close the wound. *Doc. 88-1 at 8*.

---

[2] On this date, Mr. Muhammad transferred back to the Ouachita River Unit so that he could have surgery on his leg. *Doc. 88-4 at 24*.

[3] The medical records reflect that Mr. Muhammad was distraught over the death of his only daughter.

On November 27, 2020, Mr. Muhammad fell in his cell, suffering a wound to the center of his forehead. Medical staff treated his wound, and APRN Seamster ordered an x-ray. *Id. at 10*.

On November 30, 2020, medical staff evaluated Mr. Muhammad in the infirmary because he had removed the sutures in his neck. *Id. at 12*.

On December 2, 2020, APRN Seamster entered an authorization for daily dressing changes. *Id*.

On December 4, 2020, APRN Seamster examined Mr. Muhammad for his various wounds, including his chronic right leg wound, and noted that a follow-up visit for his leg should be scheduled with the general surgeon. *Id at 14*.

On December 5, 2020, while in the infirmary for a dressing change, Mr. Muhammad began vomiting blood. He was transported to the hospital emergency room for treatment and eventually treated at Baptist Hospital in Little Rock on December 6 and 7, 2020. He was diagnosed with gastritis. *Id. at 15, 137-160*.

On December 9, 2020, Mr. Muhammad was treated at the Jones Eye Institute for complaints of flashing lights in one eye and blurred vision. *Id. at 18, 161-170*.

On December 14, 2020, APRN Seamster examined Mr. Muhammad for complaints of rectal bleeding, abdominal pain, and photophobia. *Id. at 20*.

On December 16, 2020, APRN Seamster entered a consultation request for Mr. Muhammad to have a CT before his appointment with the general surgeon, Dr. Breving, to have his right leg wound evaluated. *Id. at 21*.

On December 23, 2020, Mr. Muhammad went to the infirmary and complained that his right leg wound was infected. APRN Seamster examined him, noted a bulging fluid filled mass in the wound area, but did not note drainage or erythema. *Id. at 23*.

On December 31, 2020, Dr. Breving, a general surgeon, examined Mr. Muhammad and reviewed the CT of his right leg. Suspecting osteomyelitis, Dr. Breving recommended an urgent appointment with an orthopedic surgeon. *Doc. 88-2 at 6*. Mr. Muhammad was examined by Dr. Hubbard, an orthopedic surgeon, later that day. Dr. Hubbard recommended long-term antibiotics and surgery. *Doc. 88-2 at 7*. Additionally, a non-party unit physician, Dr. Kent, ordered three antibiotics. *Doc. 88-1 at 27-28*. However, after further consultation with Dr. Hubbard, they decided that additional antibiotics should not be prescribed. At the time, Mr. Muhammad was on "Bactrim and Augmentim with MRSA covered." *Id. at 28*.  Dr. Kent directed that the surgery recommended by Dr. Hubbard be scheduled. *Id.*

On January 4, 2021, Dr. Kent examined Mr. Muhammad's right leg. He noted "dry area with concern for dry gangrene and needs covering." *Id.* He ordered

tramadol to treat the "considerable pain" and noted the open dry wound should remain covered with a large band-aid. *Id. at 30.*

On January 14, 2021, Dr. Kent examined Mr. Muhammad's right leg again during a sick call visit and noted that the "wound looks good[,] no fever in area [,] and no edema and he has no fever! Still having pain." *Id. at 35.* Dr. Kent noted that Mr. Muhammad was "awaiting surgery" and renewed the pain prescription, for tramadol, until February 14, 2021. *Id.*

On January 28, 2021, a non-party nurse examined Mr. Muhammad during a sick call visit. The nurse noted that the right leg wound was covered with a band-aid and noticed that the authorization for wound care had expired. She called Dr. Kent for a verbal order for a treatment call and entered a referral to address Mr. Muhammad's request for a different pain medication. *Id. at 40.*

On February 3, 2021, APRN Seamster examined Mr. Muhammad for complaints of swelling and increased pain. During that visit, Mr. Muhammad claimed his right leg had gangrene and requested an increase in his tramadol dosage. APRN Seamster assessed Mr. Muhammad's condition as unchanged and found no medical indication for increasing his tramadol. Mr. Muhammad became upset during the visit and abruptly left before his blood pressure could be taken. *Id. at 44.*

On February 5, 2021, Dr. Hubbard performed a debridement of Mr. Muhammad's right tibia and placed an antibiotic nail in his leg. *Doc. 88-1 at 46;*

*Doc. 88-2 at 32-49*. Mr. Muhammad was then transported to the Ouachita River Unit

for post-surgical care, including intravenous antibiotics. *Doc. 88-1 at 46*.

From January 4, 2021 through February 4, 2021, Mr. Muhammed was

repeatedly seen by medical staff and his wound was cleaned and covered. *Id. at 30-*

*33, 35-44*.

### C.   Deliberate-Indifference Claim

Deliberate indifference to a prisoner's serious medical needs is a kind of

unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.

*Estelle v. Gamble*, 429 U.S. 97, 104 (1976). An inadvertent or negligent failure to

provide adequate medical care is different from deliberate indifference. Negligence,

even gross negligence, is not deemed "an unnecessary and wanton infliction of

pain." *Id.* at 105. Likewise, disagreement with treatment decisions cannot support a

deliberate indifference claim. *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006);

see also *Dulany v. Carnahan*, 132 F.3d 1234, 1239-40 (8th Cir. 1997) (where

medical records show that treatment was provided; and physician affidavits state that

the care was adequate, an inmate's belief that she did not receive adequate care is

insufficient to create disputed material fact). Stated another way, Defendants are

liable only if their actions were "so inappropriate as to evidence intentional

maltreatment or a refusal to provide essential care." *Dulany*, 132 F.3d at 1240-1241

(citing *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)); see also *Allard v. Baldwin*,

779 F.3d 768, 771-72 (8th Cir. 2015) (to prevail on eighth amendment claim, inmate must show that defendants' mental state was akin to criminal recklessness). Mr. Muhammad "must clear a substantial evidentiary threshold" to show that Defendants acted with deliberate indifference. *Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019).

Defendants attached to their motion the affidavit of Chris Horan, a physician licensed to practice in the State of Arkansas and the Regional Medical Director for Wellpath. *Doc. 88-5*. After reviewing Mr. Muhammad's medical records, Dr. Horan concluded that from November 20, 2020 to February 5, 2021, Mr. Muhammad "had appropriate access to healthcare" and "was provided with [medically] appropriate care and treatment for his complaints regarding his right leg." *Id. at 8-9*.

Specifically, Dr. Horan explained that, starting in November 2020, APRN Seamster authorized Mr. Muhammad to receive daily dressing changes. This allowed Mr. Muhammad to be "escorted by ADC officers to the infirmary for dressing changes by the treatment call nurse." *Id. at 2*. Dr. Horan asserts that daily dressing changes were not medically necessary as Mr. Muhammad was in a one-man cell, had no job assignment, and was able to keep the wound clean and dry. *Id*.

Dr. Horan also opines that Mr. Muhammad's leg wound was never life-threatening, that he was never diagnosed with gangrene, and that he was seen regularly for his wound care and appropriately cared for by facility medical staff.

Finally, Dr. Horan further opines that there was no medically significant delay in dressing changes. Nor was there any delay that caused any detrimental effect on his wound condition. *Id. at 3.*

In response, Mr. Muhammad points out that during a January 4, 2021 visit, Dr. William Kent noted a "concern for dry gangrene" and that the wound "need[ed] covering." *Docs. 98, 88-1 at 30.* He also asserts that gangrene is life-threatening and that over the course of 77 days, he received bandage cleaning on only 15 days. *Doc. 98 at 5.*

On this record, there is no evidence from which a fact-finder could conclude that the ongoing medical treatment Defendants provided for Mr. Muhammad's chronic right leg wound was constitutionally deficient. Mr. Muhammad's medical records show that Defendants consistently provided ongoing medical care for his chronic wound, refilled pain medication, repeatedly performed dressing changes, and referred him to multiple outside medical specialists. Eventually, Defendants scheduled an outside surgical intervention to place an antibiotic nail in his leg.

Mr. Muhammad apparently thinks that Defendants did not do enough. For example, he complains that even though he received bandage changes and wound cleansing on 15 different days between November 20, 2020 and February 5, 2021, he went "four or five days" without his dressing being changed. *Doc. 98 at 5.* This may be true. But in Dr. Horan's medical opinion, daily dressing changes were not

medically necessary. *Doc. 88-5 at 2*. Mr. Muhammad has provided no evidence to the contrary.

Most of Mr. Muhammad's complaints fall into the category of disagreeing that the medical care he received was appropriate and sufficient. But the law is well established that an inmate's disagreement with treatment decisions cannot support a deliberate indifference claim. *Gibson*, 433 F.3d at 646; see also *Dulany*, 132 F.3d at 1239-40 (where medical records show that treatment was provided; and physician affidavits state that the care was adequate, an inmate's belief that he did not receive adequate care is insufficient to create disputed material fact).

Mr. Muhammad fails to clear the "substantial evidentiary threshold" required to create a fact question as to whether any named Defendant acted with deliberate indifference. *Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019) (omitting citation).

Mr. Muhammad also provides no evidence to support any claim that a delay in receiving dressing changes or other treatment amounted to the deprivation of constitutionally-required medical care. "When an inmate claims that a delay in medical care violates the Eighth Amendment, 'the objective seriousness of the deprivation should also be measured by reference to the *effect* of the delay in treatment.'" *Redmond v. Kosinski*, 999 F.3d 1116, 1121 (8th Cir. 2021) (quoting *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (emphasis in original). "A

11

prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis." *Id*. (quoting *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011)). Here, Mr. Muhammad submits no evidence showing that a delay in his receipt of medical care adversely affected his prognosis. See *Corwin v. City of Independence, MO*, 829 F.3d 695 (8th Cir. 2016) (summary judgment appropriate where pretrial detainee failed to produce verifying medical evidence showing a detrimental effect due to delay in treating fractured wrist).

Mr. Muhammad has failed to come forward with any evidence from which a factfinder could conclude that the conduct of any remaining Defendant was even arguably criminally reckless. At the summary judgment stage, Mr. Muhammad's unsupported assertions that Defendants were deliberately indifferent are insufficient. "'When the movant makes a prima facie showing of entitlement to summary judgment, the respondent must discard the shielding cloak of formal allegations and meet proof with proof by showing a genuine issue as to a material fact.'" *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909 (8th Cir. 2010) (quoting *Flentje v. First Nat'l Bank of Wynne*, 11 S.W.3d 531, 539 (2000)). Accordingly, Defendants are entitled to summary judgment on all of Mr. Muhammad's remaining constitutional claims.

## IV.   Conclusion:

The Court recommends that Defendants' motion for summary judgment *(Doc. No. 87)* be GRANTED. Mr. Muhammad's deliberate-indifference claims should be DISMISSED, with prejudice.[4]

DATED this 5th day of January, 2023.

_____
UNITED STATES MAGISTRATE JUDGE

---

[4] It does not appear that Mr. Muhammad attempted to bring any supplemental state law claims. However, to the extent he did, the Court should decline to exercise supplemental jurisdiction over any proposed state law claims. See 28 U.S.C. § 1367(c)(3).